Robert V. Prongay (SBN 270796)
Pavithra Rajesh (SBN 323055)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:   (310) 201-9150
Facsimile:    (310) 201-9160
Email:         rprongay@glancylaw.com

Matthew M. Houston
Benjamin I. Sachs-Michaels
**GLANCY PRONGAY & MURRAY LLP**
712 Fifth Avenue
New York, New York 10019
Telephone: (212) 935-7400
Facsimile: (212) 756-3630
Email: bsachsmichaels@glancylaw.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ANDREW STAFFORD, Derivatively on Behalf of Nominal Defendant ALIGN TECHNOLOGY, INC.,<br><br>          Plaintiff,<br><br>     v.<br><br>JOSEPH M. HOGAN, JOHN F. MORICI, C. RAYMOND LARKIN JR., KEVIN J. DALLAS, JOSEPH LACOB, GEORGE J. MORROW, THOMAS M. PRESCOTT, ANDREA L. SAIA, GREG J. SANTROA, SUSAN E. SEIGEL, WARREN S. THALER, and JULIE TAY,<br><br>          Defendants.<br><br>     and<br><br>ALIGN TECHNOLOGY, INC., a Delaware Corporation,<br><br>          Nominal Defendant, | Case No.<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |

Plaintiff Andrew Stafford ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, Align Technology, Inc. ("Align" or the "Company"), against certain members of its Board of Directors (the "Board") and certain of its officers seeking to remedy defendants' breaches of fiduciary duties, insider trading (i.e. *Brophy* claim), and violations of § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Align with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## I.      NATURE AND SUMMARY OF THE ACTION

1.      Align is a medical device company that designs, manufactures, and markets devices to treat misaligned teeth.  It has two operating segments: (i) Clear Aligners, which markets Invisalign clear dental aligners; and (ii) Scanners and Services, which markets iTero intraoral scanners used to diagnose misalignment and fit Invisalign aligners.  China, which is part of the Asia Pacific geographical market, is the second largest market for the Company after the United States.

2.      In April 2019, the Company stated that its first quarter 2019 results reflected strong growth in markets led by certain countries, including China.  At conferences throughout May and June 2019, Align continued to represent that, despite competition, the Company experienced growth in China due to recent investments including manufacturing and training facilities near its Chinese customers.

3.      On July 24, 2019, Align revealed lower case shipments of its Invisalign product during second quarter 2019 "primarily due to a softness in China."

4.      On this news, Align's stock price fell $74.26, or nearly 27%, to close at $200.90 per share on July 25, 2019.

5.      These revelations precipitated the filing of a securities class action in this District against Align and certain of defendants, captioned *City of Roseville Employees' Retirement System v. Align Technology, Inc., et al.*, Case No. 3:20-cv-02897-MMC (the "Securities Class Action").

6.      Plaintiff did not make a litigation demand prior to filing this action because such demand would have been futile based upon the composition of the Board and the actions taken by the Board.  The Board is currently composed of eleven members, ten of whom are named in this action.  As alleged herein, Hogan as Chief Executive Officer and Saia, Santora, and Thaler, as members of the Audit Committee, knew that demand for the Company's products in China was declining yet allowed misleading statements to be disseminated.  Moreover, Santora, Thaler, Larkin, Lacob, and Prescott sold over $22 million in Align stock while in possession of material nonpublic information.  Thus, more than half the members would be interested in a demand to investigate their own wrongdoing.

## II.      JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Section 10(b) of the Securities Exchange Act of 1934.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

8.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## III.      PARTIES

**Plaintiff**

9.      Plaintiff Andrew Stafford purchased shares of Align in August 2017 and has continuously owned his stock since that date.

**Nominal Defendant**

10.     Nominal Defendant Align is a Delaware corporation with its principal executive offices located at 2820 Orchard Parkway, San Jose California 95134.  The Company's stock trades on the NASDAQ exchange under the symbol "ALGN."

**Defendants**

11.     Defendant Joseph M. Hogan ("Hogan") has served as Chief Executive Officer ("CEO"), President, and a director of the Company since June 2015.

12.     Defendant John F. Morici ("Morici") has served as Chief Financial Officer ("CFO") of the Company since November 2016.

13.     Defendant C. Raymond Larkin, Jr. ("Larkin") has served as Chairman of the Company's Board since February 2006.

14.     Defendant Kevin J. Dallas ("Dallas") has served as a director of the Company since May 2018.

15.     Defendant Joseph Lacob ("Lacob") has served as a director of the Company since August 1997.

16.     Defendant George J. Morrow ("Morrow") has served as a director of the Company since February 2006.  Morrow is Chair of the Compensation committee.

17.     Defendant Thomas M. Prescott ("Prescott") has served as a director of the Company since March 2002.  He served as President and CEO of the Company from March 2002 to May 2015.

18.     Defendant Andrea L. Saia ("Saia") has served as a director of the Company since July 2013.  Saia is a member of the Audit and Compensation committees.

19.     Defendant Greg J. Santora ("Santora") has served as a director of the Company since July 2003.   Santora is Chair of the Audit committee and a member of the Compensation committee.

20.     Defendant Susan E. Siegel ("Siegel") has served as a director of the Company since May 2017.

21.     Defendant Warren S. Thaler ("Thaler") has served as a director of the Company since June 2004.  Thaler is a member of the Audit committee.

22.     Defendant Julie Tay ("Tay") has served as Senior Vice President of Asia Pacific for the Company at all relevant times.

23.     The defendants named in ¶¶ 11-22 are sometimes referred to hereinafter as the "Individual Defendants."

**Non-Party Director**

24.     Anne M. Myong ("Myong") has served as a director of the Company since August 2019.

## IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

25.     By reason of their positions as officers, directors, and/or fiduciaries of Align and because of their ability to control the business and corporate affairs of Align, at all relevant times, the Individual Defendants owed Align and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage Align in a fair, just, honest, and equitable manner.  The Individual Defendants were required to act in furtherance of the best interests of Align and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Align and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

26.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Align, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Align, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

27.     To discharge their duties, the officers and directors of Align were required to exercise reasonable and prudent supervision over the management, policies, practices and controls

of the Company.  By virtue of such duties, the officers and directors of Align were required to, among other things:

    a. Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    b. Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

    c. Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

    d. When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## V.    SUBSTANTIVE ALLEGATIONS

### A.    Background

28.    Align is a medical device company that designs, manufactures, and markets devices to treat misaligned teeth.  It has two operating segments: (i) Clear Aligners, which markets Invisalign clear dental aligners; and (ii) Scanners and Services, which markets iTero intraoral scanners used to diagnose misalignment and fit Invisalign aligners.  Invisalign sales are measured in number of cases sold, and in fiscal 2018, the Clear Aligner segment accounted for approximately 86% of the Company's net revenues.

29.    Align operates in four geographical markets: North America; Asia Pacific ("APAC"); Europe, the Middle East, and Africa ("EMEA"); and Latin America.  The APAC region includes China, which is the second largest market for Align after the United States.

30.    The Company's growth relies on international expansion, including a major focus on the Chinese market.  Align's 2018 annual report identified "International Expansion" as the

first of the Company's "strategic growth drivers."  It also stated that as "core countries within the . . . APAC regions continue to grow in both number of new Invisalign trained doctors and customer utilization," the Company "support[s] that growth through investments such as headcount, clinical support, education and advertising."  Accordingly, Align would "continue to establish and expand additional order acquisition, treatment planning and manufacturing operations closer to [its] international customers."

31.     In fiscal 2018, the Company expanded its operations with a new manufacturing facility in Ziyang, China (its first aligner fabrication facility outside of Juarez, Mexico) and treatment planning operations using iTero scanners in Chengdu, China.  In the first quarter of 2019, the Company opened the Align University Training Institute in Shanghai, China to train physicians to use Align's products.

32.     On January 29, 2019, for fiscal 2019, defendant Morici forecasted "total revenue growth for the company, Invisalign and iTero to be in the middle range of our long-term operating model of 20% to 30%," including as the result of "continued growth from international regions." He stated further that "[w]e anticipate Invisalign volume to be in the middle of the range of our long-term model target of 20% to 30%."

**B.      The Individual Defendants Caused the Company to Issue Materially Misleading Statements**

33.     On April 24, 2019, the Individual Defendants caused the Company to announce its first quarter 2019 financial results and its outlook for second quarter 2019 in a press release, stating in relevant part:

**Q2 2019 Business Outlook**

For the second quarter of 2019 (Q2'19), Align provides the following guidance:
- Net revenues in the range of $590 million to $600 million, up approximately 20% to 22% over the same period a year ago
- Invisalign case shipments in the range of 380 thousand to 385 thousand, up approximately 26% to 27% over the same period a year ago
- Operating margin in the range of 24.5% to 25.4%
- Diluted EPS in the range of $1.47 to $1.54

34.     Defendants Saia, Santora, and Thaler reviewed and approved the disclosures contained in the Company's first quarter 2019 financial results and its outlook for second quarter 2019 in a press releases as members of the Audit Committee.

35.     The same day, the Company held a conference call to discuss the financial results. During the call, defendant Hogan described the Company's performance in China in positive terms, stating in relevant part[1]:

> For APAC, Q1 Invisalign volume increased 40.4% year-over-year, ***reflecting continued strong growth from nearly all country markets led by China***, Japan and ANZ. ***We also had a strong uptick in teenage patients in Q1 due in part to a teen promotion in China offered along with our teen edge sales program, intended to increase adoption of Invisalign treatment with teenagers***. We also had strong growth from GP dentists, which were [sic] up 63.5% year-over-year. On a sequential basis, Q1 was flat as expected due primarily to a seasonally lower period with the lunar new year holiday. ***During Q1, we trained nearly 1,100 new doctors in APAC, over half of which were in China. We opened our second state-of-the-art training facility in China located in Shanghai. Our new manufacturing facility in Ziyang, China is continuing to ramp***.

36.     During the same call, defendant Hogan detailed the Company's efforts to increase awareness of Invisalign and market penetration in China, stating in relevant part:

> ***In APAC, we continue to build awareness for Invisalign treatment through the use of paid media and influencer campaign[s],*** including expansion of our influencer program in the region and a pilot Invisalign First social media campaign to target parents of younger children. To leverage increasing consumer awareness and demand, we also began to expand the Invisalign Concierge program that connects interested consumers with Invisalign doctors for treatment in new countries. Globally, in the second half of the year, we will launch a new consumer advertising campaign that emphasizes the importance of doctor-led treatment with Invisalign clear aligners while also differentiating our brand. On the professional marketing side, we recently launched 2 dedicated professional Invisalign brand campaigns that feature orthodontists and GP dentists. As the "ortho as hero" campaign focuses on Invisalign orthodontists as clinical leaders and the heroes of transformative, lifechanging smiles, especially for teen and younger patients. The campaign showcases modern orthodontic practices that leverage digital approaches to treatment and are warm and inviting. The "go beyond" campaign is designed to celebrate dentists who go above and beyond every day to serve their patients. It also demonstrates the relevance of tooth movement to general dentists and the importance of integrating Invisalign with comprehensive dentistry. This was

---

[1] Unless otherwise stated, all emphasis herein is added.

launched in North America and is now being rolled out in EMEA and APAC regions.

37.     During the same call, defendant Morici discussed demand for the Company's products and the second quarter 2019 outlook, stating in relevant part:

> With that, let's turn to our Q2 outlook and the factors that inform our view, starting with the demand outlook. For international, we expect Q2 volumes to be up sequentially, reflecting seasonally stronger periods for both EMEA and APAC regions. . . . With this as a backdrop, we expect the second quarter to shape up as follows. Invisalign case volume is expected to be in the range of 380,000 to 385,000 cases, up approximately 26% to 27% year-over-year. We expect Q2 revenues to be in the range of $590 million to $600 million, up approximately 20% to 22% year-over-year.

38.     The above statements in ¶¶ 33, 35-37 were materially misleading because they failed to disclose: (i) that there was a significant decline in demand for the Company's products China; and (ii) that, as a result, Align's sales would be adversely impacted.

39.     On May 2, 2019, the Individual Defendants caused the Company to file its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2019.  Regarding international growth, including in the APAC region, the report stated, in relevant part:

> *International Invisalign Growth*. We continue to focus our efforts towards increasing Invisalign clear aligner adoption by dental professionals in the EMEA and APAC markets. **On a year-over-year basis, our International Invisalign volume increased 38.5% driven primarily by increased adoption as well as expansion of our customer base in both the EMEA and APAC regions. We continue to see growth from our international orthodontists and general practitioner ("GP") customers and are seeing more positive traction in the GP channel as we continue to segment our sales and marketing resources and programs specifically around each customer channel**. In addition, we believe that continuous product introductions and feature improvements, such as Invisalign treatment with mandibular advancement, provide our customers with continued confidence in treating complex cases as well as teen-aged patients with Invisalign clear aligners. **In 2019, we are continuing to expand in our existing markets through targeted investments in sales coverage and professional marketing and education programs, along with consumer marketing in select country markets. We expect International revenues to continue to grow at a faster rate than the Americas for the foreseeable future due to our continued investment in international market expansion, the size of the market opportunities, and our relatively low market penetration of these regions**.

40.     The above statements in ¶ 39 were materially misleading because they failed to disclose: (i) that there was a significant decline in demand for the Company's products China; and (ii) that, as a result, Align's sales would be adversely impacted.

41.     On May 14, 2019, at the Bank of America Merrill Lynch Health Care Conference, defendant Morici was asked to provide an update about Align's new manufacturing facility in China and "any other moving pieces" relevant to upcoming quarters.  He replied:

> ***You mentioned China, and that gets a lot of attention. And rightly so, it's a huge market opportunity for us.*** We've invested in our treatment planning there, and we've invested in training facilities. We have an order acquisition, and then most recently, put in manufacturing. That's one where – we've been for so long in Mexico producing well over 400,000 aligners a day. There's a massive efficiency that we have in that operation being able to transfer that technology to a place in China. We know what to do. It just takes scale. You just have to utilize that equipment more and more. ***We saw the start-up effects of it in Q4, really December, and then in Q1, we had more and more operations and more and more utilization there, and we saw some benefit there from a cost standpoint.*** And that shows up.

42.     At the same conference, defendant Morici also minimized the impact of competition on the Company's business in China, stating that "I should mention though that we've seen competition, whether it's in China or U.S. or other places, we've been competing against many of these companies that I mentioned for a number of years and still been able to grow as we have."

43.     The above statements in ¶¶ 41-42 were materially misleading because they failed to disclose: (i) that there was a significant decline in demand for the Company's products China; and (ii) that, as a result, Align's sales would be adversely impacted.

44.     On May 29, 2019, at the Stifel Dental & Veterinary Conference in New York City, defendant Morici was asked to talk about "what you're seeing specific to APAC," to which he responded:

> ***Well we see tremendous growth in APAC, in China, in particular***. We made a lot of investments in China as you know a couple of years ago, went into treatment planning, having that treatment planning in China for the first time in the first quarter. We've been able to treat 100% of the cases within China. So there's some learning and development that has to go on within China to be able to do that and be able to have the experience to get those cases through. We just put in another – announced another – a training facility in Shanghai in China.

* * *

That[ training facility has] come online now. So we have a new training there in Shanghai in addition to Chengdu and that's to meet the demands of our doctors that they want to be able to be trained. They want to be able to come with cases in hand to be able to grow their practices. So we're seeing tremendous growth. Timing of quarters, I know you get into whether we train a lot of doctors or we didn't or treatment planning or not, but we are very bullish on our growth internationally and in particular, APAC. So we look at that as over the long term. It's an area that we've invested in, and we expect to win.

45.     During the same conference, defendant Morici was asked whether, "for the foreseeable future, you still see China being fastest growth, highest ASP [i.e., average selling price]" and whether that would "remain in place for the next couple of years."  Defendant Morici responded:

> **The dynamics in China are really good for us.** It is higher ASP. They start with a higher list price. They have very complicated cases, comprehensive cases, and we've invested from a treatment planning to be in country, speak the same language, reduce the cycle time between having iTero in China. We introduced that in second quarter of last year. We went from almost no cases sent digitally to almost 50% of the cases sent digitally within China. So the appetite for growth and new technology adoption in China has been great for us. And as you mentioned, the economics work well for us.

46.     During the same conference, defendant Morici emphasized that Align's new manufacturing facility in China was satisfying growing demand for Invisalign in that market.  He stated, in relevant part:

> Well, when you're – as you mentioned Mexico, we've been manufacturing there for a number of years. Have that efficiency, have that process down. But to ship for Mexico to China, you're air shipping something and having to go through the logistics and not only is that related to that but just the time that it takes, the added time. **Whereas now, manufacturing in China, like you said, there is a ramp up.** We just started manufacturing in China in December and you go from a small amount of volume to start to utilize that facility more and more. We saw some benefits in Q1 as we start to put more throughput into that facility and increase the utilization. We'll continue to see improvement as we go through this year in terms of reducing manufacturing cost. It does reduce the freight cost because it's in China, much closer. It also reduces the cycle time for product to be shipped within China. It also has a – it's now made in China and being able to have access to some accounts, some hospitals, some groups that want or really mandate that, that things get bought or sourced within China.

47.     The above statements in ¶¶ 44-46 were materially misleading because they failed to disclose: (i) that there was a significant decline in demand for the Company's products China; and (ii) that, as a result, Align's sales would be adversely impacted.

48.     On June 5, 2019, at the Jeffries Healthcare Conference in New York City, defendant Morici was asked to describe the competitive landscape in China, and he responded:

> I mean when you think about China growth, if I was on the stage a few years ago, China wouldn't be in our top 5 from a market standpoint, and it's ***solidly #2 right now behind the U.S. Great economics there from the standpoint that massive population, growing middle class, we have higher list prices, higher ASPs in China, very complicated cases, a lot of orthodontists that we sell to, selling more and more to hospitals.*** So we recognized a few years ago that we wanted to have treatment planning. Currently majority of our treatment planning is done in Costa Rica. The first place that we went outside of Costa Rica was China and that was about 2 years ago, we've been able to have treatment planning. So those are technicians in China to be able to work with our customers to be able to provide the quality treatment that they expect. It saves time from a translation standpoint, you're in the current language, same time zone. So the timing has really improved. Just this last quarter, we've now been able to go from no cases to the treatment plan to 100% of our cases in China to be able to be done by technicians in China.
>
> We've ramped up our training. We have a training facility that's in Chengdu, right where our treatment planning is. We opened up another training in Shanghai, close to our sales office to be able to work with doctors to get them to understand our product, understand the processes, make them work with their technicians and others locally so they can understand and take on more and more complicated cases.
>
> And then most recently, we put manufacturing into China and we started manufacturing in December, started ramping up, continued to ramp up through the first quarter. That'll continue through this year and into next and with the goal that we'll have China and Greater China manufacturing locally in China and then eventually perhaps Asia Pacific manufacturing. So it's a key strategy for us. ***It's supplying and taking care of our second-biggest market, a market that's growing significantly for us*** and a key strategy that we have to go from the centralized understanding that we have to be able to design and manufacture products and be able to make that transition to be more local.

49.     When asked about the initial startup costs of the new facility in China, defendant Morici highlighted the proximity of the plant to the Company's Chinese consumers, stating:

> So we had – we went from no manufacturing to starting manufacturing in December. And so the case volume, it's very dependent on case volume. When we think of the customized aligners that we make a day, typically we're 450,000-plus aligners a day. So unique aligners that are made, vast majority are done in Mexico

and now we're ramping up within China. It's all about the number of aligners that you can put through a facility to really get that higher utilization, be able to drive down your cost. So what we saw and we guided to this year is that we'd see an impact in the first quarter as we continue to ramp up and start to utilize that facility. And we saw some effect in the first quarter, but as we look at the rest of this year, we expect our efficiency to improve and our productivity to improve within China and that should progress as you go quarter-by-quarter until you get into next year. And then you're at a cost differential because there's still so much volume that comes through Mexico, ***but you do save in China from a freight standpoint. You're closer to your customers, your freight is less and the time is less. You're able to manufacture and get your product to your customers much faster. So this is a part of our globalization strategy to be close to customers, give them the products that they want when they want them***.

50.    The above statements in ¶¶ 48-49 were materially misleading because they failed to disclose: (i) that there was a significant decline in demand for the Company's products China; and (ii) that, as a result, Align's sales would be adversely impacted.

51.    On June 6, 2019, at the William Blair Growth Stock Conference, defendant Hogan was asked about the impact of trade disputes on Align's business in China, and he emphasized the the Company's growth in consumer demand in China, stating:

Well, I can't comment on in-period obviously, but our first quarter data on China was good. ***We continue to grow there. There is a lot of under-penetration there in the sense of what consumer demand is.*** We've worked pretty hard the last few years to move treatment planning. We have treatment planning now in Chengdu and so it doesn't go to Costa Rica anymore. ***It's been a big hit with our Chinese customers.*** We moved manufacturing over, John, as you know too and that's ramping up. We're in a rental facility now and we'll go full speed with our own facility there shortly. ***So I feel regardless of what the trade dispute is or whatever, we can represent ourselves as a Chinese company now and it's still that way.*** And so that doesn't mean we'll be completely insulated from that kind of an issue, but all of the tax pieces and everything else between the 2 partners, we can see ourselves steering away from a lot of that because we have our own endemic manufacturing.

52.    The above statements in ¶ 51 were materially misleading because they failed to disclose: (i) that there was a significant decline in demand for the Company's products China; and (ii) that, as a result, Align's sales would be adversely impacted.

53.    On June 11, 2019, at the Goldman Sachs Global Healthcare Conference, defendant Morici emphasized that Align's manufacturing and training facilities provided an advantage as to the Company's proximity to Chinese customers, stating:

I think when we look at our manufacturing, we're always interested in providing better support to our customers, be closer to our customers and I think manufacturing in China, in our second largest market, demonstrates that. And like you said, we recently started manufacturing in China.

* * *

[Y]ou see us with having treatment or treatment planning, either in the region or in cases like in China, we just introduced a new training facility there in Shanghai. But being able to be closer to those doctors, get them the training that they need so that they can take on these more and more complicated cases, that drives higher utilization and that helps us grow that way.

54.     Defendant Morici also emphasized that the use of iTero scanners in China helped drive increasing volume of Invisalign sales:

China follows a similar practice as in the U.S. and so on, where having a scanner and having a scan will lend itself to more Invisalign volume.

And you're right. We've started with iTero in the second quarter of last year. We went from almost no scans, less than 5% to, as you mentioned, now in the mid40s. Close to 50% of our – the workflow that we have through China is done with the scan upfront.

So very, very fast adoption. It's a reflection of just the appetite for change, driving new technology, really embracing the digital workflow end-to-end and not have to deal with the physical impressions and some of the effort that it takes to do that, having the scan right from the start, being able to drive their higher utilization with that scan.

And remember, in China, many – they are very complicated cases that sometimes need refinements and corrections and so on, and a scanner lends itself to that. You could get a very accurate scan to begin with. And then as changes need to be made, it's another scan to be able to provide whatever adjustments are needed to be able to give that treatment.

***But China is no different from the standpoint that when you have an iTero and you really include that as part of their digital workflow and ecosystem, that drives higher and higher amount[s] of Invisalign volume.***

55.     The above statements in ¶¶ 53-54 were materially misleading because they failed to disclose: (i) that there was a significant decline in demand for the Company's products China; and (ii) that, as a result, Align's sales would be adversely impacted.

**C.      The Truth Fully Emerges**

56.      On July 24, 2019, after the market closed, Align issued a press release announcing its financial results for the second quarter of 2019, revealing deterioration of the Company's business in China.  Specifically, the Company announced:

> "In Q2, ***total Invisalign case shipments were lower than expected, primarily due to a softness in China related to a tougher consumer environment*** and slower growth in young adult case in North America. ***Given the uncertainty in China, our outlook for the third quarter reflects a more cautious view for growth in the Asia Pacific region.***"

> Based on the current growth rates in our business to date and our planned investments for the remainder of the year, we now anticipate 2019 total revenue growth rate to be at the low end of our long-term operating model target of 20% to 30%. We also expect Invisalign revenue and volume growth to be at the low end of our long-term operating model target.

57.      The same day, the Company held a conference call to discuss the financial results, and analysts pointed out that management had been "***at a lot of conferences through mid-June with the message that everything seemed okay***."  Defendant Hogan admitted knowing about the Company's declining China business, stating:

> [L]ike you said, not to be over granular though, ***I think China by far was one where – when you got to June and all, it was more difficult than what we had anticipated.*** Our China team is terrific too, ***so you do count on these guys to be able to deliver toward the end of the quarter.*** And we see that time and time again. It just didn't materialize, and that consumer sentiment piece became more and more visible to us as we got through the quarter in that way.

58.      On this news, Align's stock price fell $74.26, or nearly 27%, to close at $200.90 per share on July 25, 2019.

59.      Then, on July 25, 2019, CNBC published an article entitled "Invisalign maker warns of slowdown in China, shares plummet 27%," which quoted defendant Hogan: "Given the uncertainty in China, our outlook for the third quarter reflects a more cautious view for growth in the Asia Pacific region."  That evening, defendant Hogan appeared on CNBC's *Mad Money* for an interview, during which he explained that "we were expecting about 70% growth out of China and we achieved about 20%-30%. . . . It's not a competitive issue, it's not an operational issue at all, it's just basically a consumer backlash right now" leading to what "was broadly a China miss."

**D.      Defendants Tay, Morici, Santora, Thaler, Larkin, Lacob, and Prescott Sold Nearly $22 Million in Align Stock While in Possession of Material Non-Public Information**

Tay

60.      Defendant Tay is the Company's Senior Vice President for the Asia Pacific region with a highly sophisticated understanding of the Company's results and their import.

61.      As set forth herein, as early as May 2019, defendant Tay possessed material negative information which she knew was being concealed from investors.   Defendant Tay consciously acted to exploit her knowledge by selling over $5.5 million of Align stock to her substantial benefit, as follows:

| Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 5/8/2019 | 3,560 | $325.00 | $1,157,000 |
| 5/14/2019 | 3,500 | $315.00 | $1,102,500 |
| 5/15/2019 | 10,000 | $325.00 | $3,250,000 |
| | **17,060** | | **5,509,500** |

62.      Defendant Tay thus used her fiduciary position to enrich herself and failed to discharge her duties by causing the Company to candidly reveal the truth of its business condition.

Morici

63.      Defendant Morici is the Company's Chief Financial Officer with a highly sophisticated understanding of the Company's results and their import.

64.      As set forth herein, as early as May 2019, defendant Morici possessed material negative information which he knew was being concealed from investors.   Defendant Morici consciously acted to exploit his knowledge by selling 2,374 shares of Align stock at $286.91 per share for a benefit of approximately $681,129.

65.      Defendant Morici thus used his fiduciary position to enrich himself and failed to discharge his duties by causing the Company to candidly reveal the truth of its business condition.

Santora and Thaler

66.      Defendants Santora and Thaler serve as directors of the Company and members of the Audit committee.

67.     As set forth herein, as early as May 2019, defendants Santora and Thaler possessed material negative information which they knew was being concealed from investors.  Defendant Santora consciously acted to exploit his knowledge by selling 3,000 shares of Align stock at $313.13 per share for a benefit of approximately $939,398.  Defendant Thaler consciously acted to exploit his knowledge by selling 3,115 shares of Align stock at $306.75 per share for a benefit of approximately $973,520.

68.     Defendants Santora and Thaler thus used their fiduciary positions to enrich themselves and failed to discharge their duties by causing the Company to candidly reveal the truth of its business condition.

Larkin

69.     Defendant Larkin serves as Chairman of the Board of the Company.

70.     As set forth herein, as early as May 2019, defendant Larkin possessed material negative information which he knew was being concealed from investors.  Defendant Larkin consciously acted to exploit his knowledge by selling nearly $8.42 million of Align stock to his substantial benefit, as follows:

| Date | Shares Sold | Price | Proceeds |
|------|-------------|-------|----------|
| 5/30/2019 | 9,734 | $296.65 | $2,887,555 |
| 5/30/2019 | 18,700 | $295.67 | $5,529,029 |
|  | 28,434 |  | 8,416,584 |

71.     Defendant Larkin thus used his fiduciary position to enrich himself and failed to discharge his duties by causing the Company to candidly reveal the truth of its business condition.

Lacob and Prescott

72.     Defendants Lacob and Prescott serve as directors of the Company.

73.     As set forth herein, as early as May 2019, defendants Lacob and Prescott possessed material negative information which they knew was being concealed from investors.  Defendant Lacob consciously acted to exploit his knowledge by selling 5,000 shares of Align stock at $320.00 per share for a benefit of $1.6 million.  Defendant Prescott consciously acted to exploit his knowledge by selling 12,000 shares of Align stock at $306.98 per share for a benefit of $3,685,648.

74.     Defendants Lacob and Prescott thus used their fiduciary positions to enrich themselves and failed to discharge their duties by causing the Company to candidly reveal the truth of its business condition.

## VI.     DAMAGES TO THE COMPANY

75.     As a direct and proximate result of the Individual Defendants' conduct, Align has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

        a.     Legal fees incurred in connection with the Securities Class Action;

        b.     Any funds paid to settle the Securities Class Action; and

        c.     Costs incurred from compensation and benefits paid to the defendants who have breached their duties to Align.

76.     In addition, Align's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

77.     The actions complained of herein have irreparably damaged Align's corporate image and goodwill.  For at least the foreseeable future, Align will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Align's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VII.     DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

78.     Plaintiff brings this action derivatively in the right and for the benefit of Align to redress injuries suffered, and to be suffered, by Align as a direct result of breaches of fiduciary duty by the Individual Defendants, unjust enrichment, and violation of Section 14(a) of the Exchange Act.  Align is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

79.     Plaintiff will adequately and fairly represent the interests of Align in enforcing and prosecuting its rights.

80.    Plaintiff has continuously been a shareholder of Align at times relevant to the wrongdoing complained of and is a current Align shareholder.

81.    When this action was filed, Align's Board of Directors consisted of eleven directors: defendants Hogan, Larkin, Dallas, Lacob, Morrow, Prescott, Saia, Santora, Siegel, Thaler, and non-party director Myong.  Plaintiff did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, for the reasons set forth below.

**Defendant Hogan**

82.    At all relevant times, Hogan was the Company's President and CEO, and therefore was not independent under NASDAQ listing rules.  As an employee, Hogan derives substantially all of his income from his employment with Align, thus could not disinterestedly consider a demand for action that might require him to sue the directors that control his continued employment and/or fellow members of management with whom he works on a day-to-day basis. Moreover, as CEO, Hogan knew that demand for the Company's products in China was deteriorating. Hogan personally issued the misleading statements alleged herein.  As a result, Hogan would be interested in a demand regarding his own wrongdoing, and demand is futile as to him.

**Defendants Saia, Santora, and Thaler**

83.    Saia, Santora, and Thaler served as the members of the Audit Committee at all relevant times.  As such, they are responsible for the effectiveness of the Company's internal controls, the integrity of its financial statements, and its compliance with laws and regulations.  In their capacities as Audit Committee members, Saia, Santora, and Thaler reviewed and approved the disclosures in the Company's first quarter 2019 results and the second quarter 2019 forecast. As alleged herein, Saia, Santora, and Thaler failed to ensure the integrity of the Company's internal controls, allowing the materially misleading statements to be disseminated in Align's SEC filings and other disclosures.  Thus, Saia, Santora, and Thaler breached their fiduciary duties and are not disinterested, and demand is excused as to them.

**Defendant Prescott**

84.     Prescott was the Company's President and CEO until 2015, and therefore is not independent under NASDAQ listing rules.  As a result, Prescott would be interested in a demand regarding his own wrongdoing, and demand is futile as to him.

**Defendants Santora, Thaler, Larkin, Lacob, and Prescott**

85.     Santora, Thaler, Larkin, Lacob, and Prescott served as directors of the Company at all relevant times. As alleged herein, these directors sold over $22 million in Align stock while in possession of material nonpublic information regarding the deteriorating demand for the Company's products in China. Thus, Santora, Thaler, Larkin, Lacob, and Prescott breached their fiduciary duties and are not disinterested, and demand is excused as to them.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

86.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

87.     Each Individual Defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Align's business and affairs, particularly with respect to issues as fundamental as public disclosures.

88.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Align.

89.     In breach of their fiduciary duties owed to Align, the Individual Defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

90.     In particular, the Individual Defendants knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly represent the demand for Align's products in China.

91.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Align has sustained and continues to sustain significant damages.  Including

direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT II

**Against Tay, Morici, Santora, Thaler, Larkin, Lacob, and Prescott – *Brophy* Claim**

92.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

93.     As alleged above, Tay, Morici, Santora, Thaler, Larkin, Lacob, and Prescott are fiduciaries of Align, possessed material, non-public information of Align, and used that information improperly to profit from sales of Align stock. When Tay, Morici, Santora, Thaler, Larkin, Lacob, and Prescott directed the stock sales set forth above, they were motivated to do so, in whole or in part, by the substance of the material, non-public information they possessed, and they acted with scienter.

94.     When Tay, Morici, Santora, Thaler, Larkin, Lacob, and Prescott sold their Align stock, they knew that the investing public was unaware of the negative material information that they possessed. They also knew that if the information were disclosed, the market price of Align stock would be significantly lower. Tay, Morici, Santora, Thaler, Larkin, Lacob, and Prescott timed their stock sales to take advantage of the investing public's ignorance of the concealed material facts and obtain a higher price for the stock they sold. They thereby benefitted by misappropriating Align's non-public information.

95.     Plaintiff has no adequate remedy at law.

## COUNT III

**(Derivative Claim for Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against Defendants Hogan and Morici)**

96.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

1    97.    This Count is asserted on behalf of the Company against defendants Hogan and

2    Morici for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5

3    promulgated thereunder, 17 C.F.R. § 240.10b-5.

4    98.    Defendants Hogan and Morici, directly and indirectly, by the use of means or

5    instrumentalities of interstate commerce and/or of the U.S. mails, engaged and participated in a

6    continuous course of conduct that operated as a fraud and deceit upon the Company; made or

7    disseminated various false and/or misleading statements of material facts and omitted to state

8    material facts necessary in order to make the statements made or disseminated, in light of the

9    circumstances under which they were made or disseminated, not misleading; made or

10    disseminated the above statements intentionally or with a deliberately reckless disregard for the

11    truth; and employed devices and artifices to defraud in connection with the misleading disclosures,

12    which were intended to, and did deceive the Company, regarding: (i) a significant decline in

13    demand for the Company's products China; and (ii) the resulting adverse impact on Align's sales.

14    99.    Defendants Hogan and Morici violated Section 10(b) of the Exchange Act and Rule

15    10b-5 in that he (a) employed devices, schemes, and artifices to defraud; (b) made untrue

16    statements of material facts or omitted to state material facts necessary in order to make the

17    statements made, in light of the circumstances under which they were made, not misleading;

18    and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit

19    upon the Company in connection with the misleading disclosures.

20    100.    As alleged herein, Defendants Hogan and Morici acted with scienter in that they

21    knew that the public documents and statements issued or disseminated in the name of the

22    Company were materially false and misleading; knew that such statements or documents would be

23    issued or disseminated to the investing public; and knowingly and substantially participated or

24    acquiesced in the issuance or dissemination of such statements or documents as primary

25    violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants Hogan

26    and Morici, by virtue of their receipt of information reflecting the true facts regarding Align, their

27    control over, and/or receipt and/or modification of Align's allegedly materially misleading

28

statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Align, participated in the fraudulent scheme alleged herein.

101.    As a result of Defendants' misconduct, Align the Company is suffering litigation expense and reputational harm in the marketplace in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5.

102.    Plaintiff brought this claim within two years of its discovery of the facts constituting the violation and within five years of the violation.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff, on behalf of Align, demands judgment as follows:

A.    Declaring that plaintiff may maintain this action on behalf of Align and that plaintiff is an adequate representative of the Company;

B.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

C.    Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Align

D.    Directing Align to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Align and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.    a proposal to strengthen the Company's controls over financial reporting;

2.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.    a proposal to strengthen Align's oversight of its disclosure procedures;

4.    a provision to control insider transactions; and

1          5.   a provision to permit the stockholders of Align to nominate at least three candidates

2 for election to the Board;

3          E.        Extraordinary equitable and/or injunctive relief as permitted by law, equity, and

4 state statutory provisions sued hereunder, including attaching, impounding, imposing a

5 constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their

6 other assets so as to assure that plaintiff on behalf of Align has an effective remedy;

7          F.        Awarding to Align restitution from defendants, and each of them, and ordering

8 disgorgement of all profits, benefits, and other compensation obtained by the defendants;

9          G.        Awarding to plaintiff the costs and disbursements of the action, including

10 reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

11          H.        Granting such other and further relief as the Court deems just and proper.

12 **JURY DEMAND**

13          Pursuant to Fed. R. Civ. P. 38(b), plaintiff a trial by jury.

14 DATED: May 4, 2020           **GLANCY PRONGAY & MURRAY LLP**

15           By:   *s/ Robert V. Prongay*

16           Robert V. Prongay
          Pavithra Rajesh

17           1925 Century Park East, Suite 2100
          Los Angeles, CA 90067

18           Telephone:  (310) 201-9150
          Facsimile:  (310) 201-9160

19           Email:  rprongay@glancylaw.com

20           Matthew M. Houston

21           Benjamin I. Sachs-Michaels
          712 Fifth Avenue

22           New York, NY 10019
          Telephone: (212) 935-7400

23           Facsimile: (212) 756-3630
          Email: bsachsmichaels@glancylaw.com

24

25           *Attorneys for Plaintiff Andrew Stafford*

26

27

28

<u>**VERIFICATION**</u>

I, Andrew Stafford, do hereby verify that I am a holder of common stock of Align

Technology, Inc., and was a holder of such common stock at the time of the wrongs complained

of in the foregoing Verified Shareholder Derivative Complaint ("Complaint").  I have authorized

the filing of the Complaint.  I have reviewed the Complaint.  All of the averments contained in the

Complaint regarding me are true and correct upon my personal knowledge and, with respect to the

remainder of the averments, are true and correct to the best of my knowledge, information, and

belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date:  5/4/2020

Andrew Stafford